## SLOAN v. GULF REFINING CO. OF LOUISIANA.

### No. 1919.

Court of Appeal of Louisiana. Second Circuit.
Jan. 11, 1924.

J. S. Atkinson and F. E. Greer, both of Shreveport, for appellant.

F. T. Jones, of Marshall, Tex., and Hall & Bullock, of Shreveport, for appellee.

PORTER, J.

On the night of November 16, 1920, the plaintiff suffered a serious physical injury from a collision between a Ford roadster, belonging to his employers, Morris & Co., and a five-ton loaded truck, belonging to the defendant company; and in this suit he seeks to recover damages against defendant company in the sum of $25,000, and legal interest from judicial demand. There was trial before a jury, which rendered a verdict for plaintiff for $4,500, and, from a judgment in accordance therewith, the defendant company appeals. The plaintiff has answered the appeal and prayed for an increase of the judgment.

A short time before the day of the accident, the day before perhaps, the plaintiff was employed by Morris & Co., a Shreveport concern, as traveling salesman, and assigned to the territory along the Shreveport-Mooringsport road. This road is a hard-surfaced highway connecting Shreveport with a number of towns and villages, and passing through extensive oil and gas fields lying northwest of Shreveport. On the afternoon of the day of the accident, plaintiff went to the store of Morris & Co. and was instructed by Mr. Jones, the manager of the firm, as to the line of goods which he was to sell, and, according to the uncontradicted testimony of Jones, a Ford roadster, which he knew how to drive, was assigned to him. As he was unacquainted with the customers on the route to which he was assigned, the manager instructed J. M. Ivey, a shipping clerk in the employ of the company, to take plaintiff in the car, show him over the route, and introduce him to its customers. They went as far as Mooringsport, where plaintiff was introduced to a number of business men, and where several orders were taken. Ivey says that plaintiff took the orders and "I just assisted him." They started to return to Shreveport, and when they had reached a point some six or eight miles from the latter place darkness came on; and when they undertook to turn the lights on they discovered that they could not do so on account of some defect in the lighting apparatus. There was some discussion between the plaintiff and Ivey, the latter driving the car and plaintiff being seated on his right, as to whether they should proceed with an unlighted car; and they finally concluded to do so. As this discussion, brief as it was, is an important matter in the further consideration of the case, we quote the testimony of the plaintiff and Ivey on the subject:

Ivey, referring to the lights, said:

"I tried to fix them, but I couldn't. I had an idea there was a short in the wire somewhere, but I couldn't find it."

"Q. Did Mr. Sloan say anything to you then? A. He asked me if I thought we would get in to town without them. I told him we could get as far as the first garage, that it was against the law to come in without lights, but we could go to the first garage and have them fixed, and he said that if I would drive slow that it was satisfactory with him."

He says that he was acquainted with the road; that they came on in; and that he started driving between eight or ten miles an hour, between eight and twelve miles an hour, anyway, and that he drove to the right side of the road all the time. Ivey was a witness for the plaintiff.

The plaintiff testified as follows:

"Yes, I told Ivey it was getting dark and he had better turn on the lights, and he got out to do so and discovered we didn't have any lights to turn on. I don't mean we didn't have the equipment, but they were out, and it was insufficient or rather it was out of order and I was not a mechanic and I didn't know how to fix the car. I know how to drive a Ford, but I don't know how to fix a car when anything gets wrong with it. And Ivey got back in and said, 'How are we going to get to Shreveport?' He said, 'I am familiar with the road. I can go.' And I said, 'All right, if you drive slowly,' and he started on down the road to come on in."

"Q. How did he drive? A. He drove care-

fully. He made the remark at the time about driving carefully; 'I think I can make it all right. If we meet any cars they probably will have lights and we can pull out and give them the road.' And we came on figuring that if we met any cars they would have lights. He drove carefully and slowly. I judge 'he was making from eight to twelve miles an hour—I couldn't say—It was dark and I cannot be sure, but not over eight or twelve miles an hour.

"Q. What were you doing? A. I was simply sitting there as a passenger. We were not conversing very much. Once in a while we would say something, but were sitting there watching the road."

"Q. Were you watching the road? A. Absolutely. I surely wouldn't be out with a fellow driving on a dark night without looking."

They drove along without mishap to within about three and a half miles of Shreveport, when they collided with an unlighted truck belonging to the defendant company, which was going from Shreveport to Mooringsport; and the plaintiff was thrown from the car and injured, while the truck was pretty badly battered up, and the car was as badly wrecked.

The driver of the truck and his helper, a negro man, both testify that when the collision occurred they had drawn to the right-hand side of the road and stopped to put on the lights; and that when the car struck them it was running at a high speed. Jordan, the man in charge of the truck, estimates it at from 35 to 40 miles an hour. Plaintiff and Ivey say they were not running faster than eight or twelve miles an hour. This witness' testimony was taken under commission. Frank Hall, the colored man, who was his helper at the time, was a witness for the defendant, and his testimony, except as to the fact that the truck was standing still, for the purpose above stated, at the time of the accident, was pretty badly shaken, because he contradicted himself in a number of instances. It is, perhaps, not out of place to say that the witness appears to have been considerably "rattled" by the rather vigorous cross-examination to which he was subjected by the able counsel for the plaintiff.

We do not, however, regard the facts with reference to the position and speed of the truck, and of the conduct of the persons in charge of it, as of controlling importance in the determination of the case, and we may well concede that those in charge of it were guilty of the negligence charged in the petition.

The plaintiff, in effect, judicially admits that it was negligence to drive either the car or the truck on the public highway on a dark night, without lights.

In his petition, he charges the defendant company with negligence because its servants drove the truck "more on the left side of said road than to the right or center thereof," and because its servants "were" (at the time of the accident) "driving and operating said truck upon the road without being provided with lights, or without lights burning and displayed thereon, it being dark at the time."

It is further charged that Morris & Co. was guilty "of negligence which was one of the proximate causes of plaintiff's injuries in that said car in which petitioner was riding was furnished by it to be used in said work on said trip without lights, or without a lighting system thereon."

We find in the record an ordinance of the police jury of Caddo parish, which was filed in evidence by the defendant, which provides, among other matters, for lights on motor vehicles on the public roads at night, under a penalty for the violation thereof of not less than five nor more than one hundred dollars, or imprisonment for not less than five nor more than thirty days, or both fine and imprisonment at the discretion of the court.

"Where a standard of duty is fixed, and its measure defined by law, the omission is negligence per se." Tucker v. Railroad Co., 42 La. Ann. 114, 7 So. 124.

■ Independently of any law on the subject, it was the grossest kind of negligence to drive an automobile along a public road in the dark, and particularly over the road in question.

The defendant denies that its servants were guilty of any negligence in the operation of its truck, and, in the alternative, pleads contributory negligence on the part of the plaintiff.

Learned counsel for plaintiff discuss at considerable length, first, whether or not the mission upon which plaintiff and Ivey were engaged was a common enterprise, and, second, the relations which they bore toward each other; and they conclude that their duties on the occasion in question did not involve a common enterprise, and, as we understand them, their position seems to be that the plaintiff was the mere guest of Ivey, and that the latter's negligence cannot be imputed to the plaintiff.

These two questions, in their various aspects, have been the subject of a vast number of decisions by the courts of this country, many of which are hopelessly conflicting.

In a late work, Babbitt on Automobiles, section 1357, the author says in regard to the question of common enterprise:

"An examination of all of the recent cases on the subject fails to disclose any principle whatever in these decisions, cases with similar states of facts being decided in utter conflict with each other."

Under these conditions, we are not disposed to consume much time in an effort to

determine just what status the plaintiff and Ivey occupied toward each other, except to suggest that, perhaps, plaintiff unconsciously has thrown light upon the subject which tends to indicate that he regarded himself as, at least, not inferior in authority to Ivey. He says, in the testimony quoted heretofore, that he told Ivey it was getting dark and he had better turn on the lights, and that Ivey got out and tried to turn them on; and that when Ivey found that the lights could not be turned on, he asked him (plaintiff) how they were going to get to Shreveport and said that he was familiar with the road, whereupon plaintiff said, "All right, if you drive slowly." The above indicates that plaintiff was in command of the situation.

■ Nevertheless, we shall, for the sake of argument, concede all that plaintiff's counsel claim on this score and consider plaintiff as the guest of Ivey. And while this view of the matter is, in the light of the facts, highly favorable to plaintiff, his admitted conduct on that occasion is fatal to his recovery. We say this because there is one proposition of law upon which the courts everywhere are agreed. It is this:

"It must be taken as a rule of law, everywhere recognized, that a passenger in any conveyance, public or private, related or unrelated to his driver, must, in order to recover for injuries sustained through the negligence of a third party, be himself wholly free from contributory fault." 8 L. R. A. (N. S.) page 671. Notes to Cotton v. Willmar & S. F. R. Co. In this note syllabi from some seventy cases from states in every section of the country are quoted in support of the above text.

As illustration of the above doctrine, the following might be mentioned:

An Indiana case held that a wife riding with her husband, who drove on a railroad track without looking or listening, could not recover for the injury which resulted, because she failed to warn her husband, which she could have done if she had exercised reasonable care, in time to have avoided the accident. Miller v. Louisville, N. A. & C. R. Co., 128 Ind. 97, 27 N. E. 339, 25 Am. St. Rep. 416.

And in a Kansas case, a woman was denied recovery for injuries received in an accident at a railroad crossing while riding in a vehicle furnished and driven by her escort; because, having equal opportunity with him to see and appreciate the danger, she neither advised nor suggested caution or delay. Bush v. Union Pac. R. Co., 62 Kan. 709, 64 P. 624.

And a Massachusetts case held that a plaintiff could not recover for injuries received in a collision with a railroad train where he, riding in a vehicle driven by another, trusted his safety entirely to the driver, and failed to exercise reasonable care himself. Allyn v. Boston & A. R. Co., 105 Mass. 77.

The controlling thought in all of them, and in many others like them, is that the injured party sanctioned the negligent conduct of the driver, which he knew, or could have known, by failing to protest, or to adopt any means of protecting himself from the apparent danger.

These cases are not founded upon the theory of imputed negligence, but upon the fact of direct negligence by the party injured.

In the case of Dixon v. Railroad Co., 139 La. at page 336, 71 So. 527, 529, the court said:

"It is unnecessary for this court to consider this case from the point of view of negligence in plaintiff' as a passenger. But we may state that it has been held by respectable authorities that a passenger riding with the driver, and having an equal opportunity to exercise his faculties, and failing to do so, cannot recover damages from a railroad company." Citing Thompson on Negligence, Vol. 1, §§ 499, 503; Berry on Law of Automobiles, page 176.

In a case decided a few years ago, Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L. R. A. 1917F, 253, our Supreme Court, in one of the most sensible decisions which we have read, declared that a guest in an automobile, possessed of all of his faculties and knowing that there is always some danger in traveling in an automobile, assumes the risk of ordinary dangers of which he is aware.

It is true that the court found as a matter of fact that the defendant, the owner and driver of the machine, was not guilty of any negligence, and it is also true that the defense of contributory negligence does not appear to have been urged. But the court, in reviewing a number of cases upon which the plaintiff relied, emphasized the fact that in all of them, except two, the guest who was injured and who was the plaintiff, had protested against the negligence of the driver, and in two of them had even begged to be allowed to get out of the vehicle. One of the exceptions was that of a boy of fourteen, who was being driven by his employer to his place of work when he was injured. Of course, a lad of such an age would not be expected to protest against the negligence of his employer. In the other case, the plea of contributory negligence was not an issue.

■ If a person riding in an automobile assumed the ordinary perils incident to that mode of travel, how much more so must he be held to assume the extraordinary dangers incident to blundering along in an unlighted car on a much-traveled highway, at a speed of, admittedly, from eight to twelve miles an hour, on a night so dark that he could not see so big a thing as a truck until he got within thirty or forty feet of it? In all human prob-

ability, the accident would not have happened but for the fact that the car in which plaintiff was riding had no lights upon it. According to his own statement, both he and Ivey realized the danger, and, after discussion and deliberation, consented to encounter it. They "figured" that every other vehicle which they met would be lighted. Plaintiff was, at least, equally to blame for a course of conduct which endangered not only their own safety, but that of the public as well.

The judgment appealed from is reversed and set aside, and the plaintiff's demand is rejected at his costs.

OGLESBY, J., not having been a member of the court when this case was argued and submitted, takes no part.